Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
John P. Mulvaney, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                  Plaintiffs,

       -against-

AKIVA IMAGING INC., RASHBI DIAGNOSTICS
IMAGING INC., I&A IMAGING LLC, SHAARE TZION
IMAGING LLC, HEALTHCARE MEDICAL SERVICES
PLLC, DS MEDICAL DIAGNOSTICS P.C., RASHBI
VENTURES LLC, ARTUR KOFMAN, ISAAC MIZRAHI,
DAVID MODNYY, ELCHIN RAFAILOV, ALEC
MILLER, DANIEL SHIFTEH, M.D., HANAN MILLER,
M.D., and JOHN DOE DEFENDANTS "1"-"10"

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.: _____(     )

**Plaintiffs Demand a Trial by Jury**

## COMPLAINT

     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Akiva Imaging Inc., Rashbi Diagnostics

Imaging Inc., I&A Imaging LLC, Shaare Tzion Imaging LLC, Healthcare Medical Services PLLC,

1

DS Medical Diagnostics P.C., Rashbi Ventures LLC, Artur Kofman, Isaac Mizrahi, David Modnyy, Elchin Rafailov, Alec Miller, Daniel Shifteh, M.D., and Hanan Miller, M.D. (collectively, the "Defendants") hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $665,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non reimbursable healthcare services, including the professional and technical components associated with the performance of magnetic resonance imaging studies ("MRIs") (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims that were insured by GEICO ("Insureds").   The Fraudulent Services were allegedly performed and billed to GEICO and other New York automobile insurers using a series of entities known as Akiva Imaging Inc. ("Akiva"), Rashbi Diagnostics Imaging Inc. ("Rashbi Diagnostics"), I&A Imaging LLC ("I&A"), Shaare Tzion Imaging LLC ("Shaare"), Healthcare Medical Services PLLC ("HMS"), and DS Medical Diagnostics P.C. ("DS Medical") (collectively, the "Provider Defendants") each of which are New York corporations and/or limited liability companies.

2.      The Provider Defendants are comprised of two groups: (i) Akiva, Rashbi Diagnostics, I&A, and Shaare (collectively, the "TC Defendants"), which billed GEICO and other New York automobile insurers for the technical component of the Fraudulent Services; and (ii) HMS and DS Medical (collectively, the "PC Defendants"), which billed GEICO and other New York automobile insurers for the professional component of the Fraudulent Services. The TC Defendants are not licensed New York professional corporations and are not owned by licensed healthcare professionals.

3.      Defendant Artur Kofman ("Kofman") - a layperson and the principal stakeholder in the TC Defendants - is the architect of and mastermind behind the fraudulent scheme. To enable the TC Defendants to submit billing to no-fault insurers, Kofman recruited the PC Defendants and their physician owners, Daniel Shifteh, M.D. ("Shifteh") and Hanan Miller, M.D. ("H. Miller") (collectively, the "PC Owners") to become part of the scheme.  In connection with implementing and ensuring his control of the fraudulent scheme, Kofman created Rashbi Ventures, LLC ("Rashbi Ventures"), through which he opened, controlled, and operated an MRI imaging facility without any physician oversight. Kofman further recruited Defendants Isaac Mizrahi ("Mizrahi"), David Modnyy ("Modnyy"), Elchin Rafailov ("Rafailov"), and Alec Miller ("A. Miller") (collectively, with Kofman, the "Management Defendants"), who became members of one or more of the TC Defendants and assisted in the running of their day-to-day operations in furtherance of the fraudulent scheme.

4.      At its core, the Defendants' scheme was designed to create fraudulent "billing opportunities" for alleged MRI services that were provided to Insureds pursuant to improper *quid pro quo* arrangements with the Provider Defendants, unlawful kickback and referral arrangements with individuals associated with the clinics from which the referrals originated and issuing MRI reports with fictitious clinical histories and/or fabricated or grossly exaggerated "findings." Moreover, in all cases, the Fraudulent Services were performed either: (i) by independent contractor technicians located at a third-party MRI facility; or (ii) at MRI facilities controlled and operated by Kofman and one or more of the other Management Defendants without any physician supervision or oversight.

5.      To obtain access to patients who were necessary for the Provider Defendants' fraudulent billing opportunities, Kofman, with the assistance of the Management Defendants,

3

entered into unlawful kickback and referral arrangements with individuals associated with New York multidisciplinary clinics that catered primarily to patients with no-fault insurance (the "Clinics"). Pursuant to these arrangements, the Clinics issued written referrals for MRI services and steered patients to the Provider Defendants, typically at or shortly after the patient's first visit and without regard for whether the MRI services were medically necessary. In exchange, the PC Defendants issued MRI reports that virtually always contained: (i) fictitious clinical histories to justify Provider Defendants' performance of the MRIs; and/or (ii) at least one MRI study per Insured with multiple fabricated and/or grossly exaggerated "findings" that could in turn be used by providers at the Clinics to justify ordering and/or performing additional treatments and diagnostic tests.

6.      Contrary to the fraudulent representations contained in the Provider Defendants' billing submissions to GEICO, none of the Insureds who received MRI services from the Provider Defendants did so pursuant to legitimate referrals to the PC Defendants, as the PC Owners did not know or have any relationship with the providers at the Clinics who issued the MRI referrals. In truth, the referrals for the Fraudulent Services issued from the Clinics were routed directly to the TC Defendants and the Management Defendants pursuant to their unlawful kickback and referral arrangements with the individuals associated with the Clinics, including John Doe Defendants "1" – "10". In keeping with the fact that the MRI services were not the result of legitimate referrals, the MRI reports were often not addressed to the referring provider and the PC Defendants played no role in transmitting the MRI reports to the referring providers at the Clinics.

7.      After receiving the referrals, the Management Defendants, through the TC Defendants, controlled and/or dictated virtually all aspects of the scheme.  First, the TC Defendants scheduled Insureds to receive MRIs at either: (i) an MRI facility controlled and operated by

Kofman and one or more of the other Management Defendants; or (ii) at a third-party MRI facility pursuant to an arrangement whereby the respective TC Defendant paid a fee to that MRI facility in exchange for performance of MRIs on the Insured. In either case, in addition to providing their own paperwork for Insureds to sign, the TC Defendants also provided all of the PC Defendants' paperwork to the Insureds when they arrived at the MRI facilities, including Assignment of Benefit ("AOB") forms for the Insured to sign on behalf of the PC Defendant.

8.      After the MRI images were generated, the TC Defendants had the images uploaded to an electronic medical records service so that the PC Owners and/or radiologists employed by the PC Defendants could access and review the studies remotely. Pursuant to their *quid pro quo* arrangements with the Management Defendants, the PC Defendants generated MRI reports with fictitious clinical histories where virtually every Insured had at least one MRI study with multiple fabricated and/or grossly exaggerated "findings." Then, the PC Defendants stored those MRI reports within an electronic medical records service that was chosen by the TC Defendants and the Management Defendants so that they could have direct and unfettered access to PC Defendants' patient records. In keeping with the fact that the Management Defendants dictated the performance of the Fraudulent Services, the TC Defendants were responsible for transmitting the MRI reports to the Clinics from which the referrals originated.

9.      Upon information and belief, the PC Defendants and PC Owners never visited any of the MRI facilities in person, never interacted directly with any Insured, never evaluated the Insureds' presenting problems or clinical histories at any time prior or subsequent to the performance of the MRI services, never supervised the MRI technicians or oversaw their performance of the MRI services at issue, and never ensured that proper MRI machine maintenance or quality control standards were in effect or enforced at any of the MRI facilities.

10.    At bottom, Defendants' scheme was designed so that, among other things: (i) the Management Defendants, through the TC Defendants, controlled almost every aspect of the fraudulent scheme; and (ii) the PC Defendants could carry out their necessary role of performing the professional component of the MRI services without any involvement by the PC Owners or their radiologist employees in the MRI facilities and the TC Defendants' day-to-day operations, ostensibly to falsely claim that they lacked any knowledge of the fraudulent scheme in the event it was uncovered.

11.    By this action, GEICO seeks to recover the monies wrongfully obtained from it, totaling more than $665,000.00, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.8 million in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

(i)     the Fraudulent Services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and as a result of unlawful *quid pro quo*, kickback, and referral arrangements;

(ii)    the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to whether they were medically necessary, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings";

(iii)   the Fraudulent Services failed to conform to the requirements of the New York State Workers' Compensation Fee Schedule; and

(iv)    the Fraudulent Services, in many cases, were provided by independent contractors, not the Provider Defendants' employees.

12.    The Defendants fall into the following categories:

(i)     The Provider Defendants - Akiva, Rashbi Diagnostics, I&A, Shaare, DS Medical, and HMS - are the entities through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO. Akiva, Rashbi Diagnostics, I&A, and Shaare comprise the TC Defendants, as they billed for the technical component of the Fraudulent Services.  DS Medical and HMS comprise the

PC Defendants, as they billed for the professional component of the Fraudulent Services.

(ii)    The Management Defendants are comprised of Kofman, Mizrahi, Modnyy, Rafailov, and A. Miller, who are members of some, or all, of the TC Defendants;

(iii)   Rashbi Ventures is an entity in which Kofman is a member and which was used in connection with Kofman's control and operation of an MRI facility; and

(iv)    John Doe Defendants "1" through "10" are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the provision of the Fraudulent Services and engaging in unlawful kickback and referral arrangements to obtain patient referrals for the Provider Defendants.

13.    As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were provided pursuant to the dictates of laypersons (*i.e.*, the Management Defendants) not licensed to render healthcare services and as a result of unlawful *quid pro quo*, kickback, and referral arrangements; (ii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to whether they were medically necessary, which included creating MRI reports with fictitious clinical histories and fabricated and/or grossly exaggerated "findings"; (iii) the Fraudulent Services failed to conform to the requirements of the New York State Workers' Compensation Fee Schedule; and (iv) the Fraudulent Services, in many cases, were provided by independent contractors, not the Provider Defendants' employees.

14.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services billed to GEICO through the Provider Defendants.

15.    The charts annexed hereto as Exhibits "1" through "6" set forth a representative sample of the fraudulent claims that have been identified to date that Defendants submitted, or caused to be submitted, to GEICO.

16.     The Defendants' fraudulent scheme began as early as 2022 and continued uninterrupted through the present day, as the Provider Defendants continue to attempt collection on the pending charges for the Fraudulent Services.

17.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $665,000.00.

## THE PARTIES

### I.     Plaintiffs

18.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### II.     Defendants

19.     Defendant Kofman resides in and is a citizen of New York. Kofman is a member of Rashbi Ventures and all four TC Defendants: Akiva, Rashbi Diagnostics, I&A, and Shaare.

20.     Defendant Mizrahi resides in and is a citizen of New York. Mizrahi is a member of Akiva and I&A.

21.     Defendant Modnyy resides in and is a citizen of New York. Modnyy is a member of Akiva and Rashbi Diagnostics.

22.     Defendant Rafailov resides in and is a citizen of New York.  Rafailov is a member of Rashbi Diagnostics and I&A.

23.     Defendant A. Miller resides in and is a citizen of New York. A. Miller is a member of I&A and Shaare.

24.     Defendant Shifteh resides in and is a citizen of New York. Shifteh was licensed to practice medicine in New York on November 14, 2000, and purports to own DS Medical.

25.     Defendant H. Miller resides in and is a citizen of New York. H. Miller was licensed to practice medicine in New York on March 3, 1998, and purports to own HMS.

26.     Defendant Akiva is a limited liability company that was formed in New York on or about September 22, 2022, has its principal place of business in New York, and has Kofman, Modnyy, and Mizrahi as its members.  Akiva has been used by Kofman, Modnyy, Mizrahi, and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other New York automobile insurers.

27.     Defendant Rashbi Diagnostics is a limited liability company that was formed in New York on or about April 5, 2022, has its principal place of business in New York, and has Kofman, Modnyy, and Rafailov as its members. Rashbi Diagnostics has been used by Kofman, Rashbi Ventures, Modnyy, Rafailov, and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other New York automobile insurers.

28.     Defendant I&A is a limited liability company that was formed in New York on or about January 8, 2023, has its principal place of business in New York, and has Kofman, Rafailov, A. Miller, and Mizrahi as its members.  I&A has been used by Kofman, Rafailov, A. Miller, Mizrahi, and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other New York automobile insurers.

29.     Defendant Shaare is a limited liability company that was formed in New York on or about June 27, 2023, has its principal place of business in New York, and has Kofman and A. Miller as its members.  Shaare has been used by Kofman, A. Miller, and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other New York automobile insurers.

30.     Defendant HMS is a New York professional corporation with its principal place of business in New York. HMS was incorporated in New York on or about May 8, 2014, and purports to be owned by H. Miller. HMS has been used by Akiva, Rashbi Diagnostics, Kofman, Modnyy, Mizrahi, Rafailov, H. Miller, and John Doe Defendants "1"–"10" as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

31.     Defendant DS Medical is a New York professional corporation with its principal place of business in New York.  DS Medical was incorporated in New York on or about June 29, 2018, and purports to be owned by Shifteh. DS Medical has been used by Rashbi Diagnostics, I&A, Kofman, Modnyy, Rafailov, A. Miller, Mizrahi, Shifteh, and John Doe Defendants "1"–"10" as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

32.     Defendant Rashbi Ventures is a limited liability company that was formed in New York on or about January 8, 2023, has its principal place of business in New York, and has Kofman as its member. Rashbi Ventures was used to control and operate an MRI facility located at 25302 Rockaway Boulevard, Rosedale, New York, from which Rashbi Diagnostics operated.

33.     Upon information and belief, John Doe Defendants "1" through "10" reside in and are citizens of New York.  John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the provision of the Fraudulent Services and engaging in unlawful kickback and referral arrangements to obtain patient referrals for the Provider Defendants in order to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

34.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

35.     This Cout also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

36.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

37.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

38.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws Governing No-Fault Reimbursement**

39.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

40.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Person Injury Protection Benefits ("No-Fault Benefits") to Insureds.

11

41.     No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including the technical component of those healthcare services.  See N.Y. Ins. Law § 5102(a).

42.     Pursuant to the No-Fault Laws, healthcare services providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying healthcare services.

43.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

44.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law. In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

45.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv)

absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.  It is a crime in New York to practice medicine without a license and/or to aid or abet a person to practice without a license.  See e.g., New York Education Law § 6512.

46.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for referrals for healthcare services. See, e.g., N.Y. Educ. Law §§ 6509(10), 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

47.     Prohibited kickbacks include more than a simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."  See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

48.     Pursuant to the New York No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

49.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the actual provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer,

where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

50.     Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

51.     Alternatively, a healthcare services provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500" form).

52.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

53.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

54.     Under the Fee Schedule, No-Fault Benefits for medically necessary expenses can include certain services as having both a technical and a professional component.

55.     The technical component of a medically necessary service generally includes the act of physically administering the service and may be performed by an individual who is not a licensed healthcare professional.

56.     The professional component of a medically necessary service must be provided by a physician or other qualified healthcare professional and generally includes services such as test result interpretation and/or the provision of a written report.

57.     To ensure that Insureds' $50,000.00 in No-Fault Benefits are not artificially depleted by inflated charges for services containing a technical component and a professional component, the Fee Schedule specifies the maximum charges that may be submitted by a healthcare services provider for such services.

58.     More specifically, for medically necessary services designated as having both a technical component and a professional component, the Fee Schedule specifies the percentage of the total charge that is allocated to the performance of the technical component and the percentage of the total charge that is allocated to the performance of the professional component. This is commonly referred to as the "PC/TC Split."

59.     For example, pursuant to the Fee Schedule, if an Insured were to receive a cervical MRI without contrast that qualified for reimbursement under CPT code 72141, the Fee Schedule designates an 20/80 PC/TC Split.  In other words, one provider may bill 20% of the total permissible charge for the provision of the professional component of the MRI and another provider may bill 80% of the total permissible charge for the provision of the technical component of the same MRI.

60.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 forms submitted by healthcare services providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

61.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare services provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II.     The Defendants' Fraudulent Scheme

### A.     Overview of the Defendants' Fraudulent Scheme

62.     Beginning in 2022 and continuing through the present day, Defendants implemented a complex fraudulent scheme in which they used the Provider Defendants to exploit patients for financial gain by billing the New York automobile insurance industry for hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise non-reimbursable MRI services.

63.     In New York, only a licensed healthcare professional may practice a healthcare profession, own and control a professional corporation authorized to operate a professional healthcare practice, employ and supervise other healthcare professionals, and derive direct economic benefit from healthcare professional services, absent statutory exceptions not applicable in this case.

64.     Nevertheless, the Management Defendants, none of which are professional corporations or licensed healthcare providers, used the façade of the TC Defendants to create fraudulent "billing opportunities" for MRI services by devising a scheme whereby they controlled and dictated the performance of Fraudulent Services to automobile accident victims, including GEICO's Insureds. In furtherance of the scheme, Kofman, with the aid of the other Management Defendants, recruited and entered into *quid pro quo* arrangements with the PC Defendants and PC

Owners and entered into unlawful kickback and referral arrangements with individuals associated with the Clinics in order to obtain access to patient referrals.

65.     Accordingly, the Fraudulent Services billed under the names of the Provider Defendants were fraudulent and non-reimbursable because they were provided pursuant to the dictates of unlicensed laypersons, not permitted by law to render or control the provision of healthcare services, and unlawful kickback and referral arrangements, rather than the result of any legitimate referral from a licensed professional.

66.     Likewise, the Fraudulent Services billed under the names of the Provider Defendants were also fraudulent and non-reimbursable because they provided pursuant to pre-determined referral protocols designed solely to financially enrich the Defendants and without regard to medical necessity, rather than to treat or otherwise benefit the Insureds.

67.     In that regard, the Provider Defendants often obtained sham referrals from the Clinics that purported to contained signatures of an alleged referring physician, ostensibly to create the appearance of medical need and oversight by a licensed professional in order to support the billing for the Fraudulent Services through the Provider Defendants.  In keeping with the fact that Defendants performed MRI services pursuant to sham referrals, the purported physician signatures on certain MRI referral forms were "copies" or "stamps" of the physician's signature affixed by individuals at the Clinics, including John Doe Defendants "1"-"10". In addition, the MRI referrals were typically issued during or shortly after the Insured's first visit to the Clinics, regardless of the Insured's individual presenting symptoms and before the Insured had undergone a standard course of conservative treatment.

68.     Pursuant to the unlawful kickback and referral arrangements, the Provider Defendants obtained MRI referrals that originated from over twenty-seven (27) Clinics located throughout the New York metropolitan area, including the following locations:

- 1 Cross Island Plaza, Rosedale 11422;
- 102-34 Atlantic Avenue, Ozone Park 11416;
- 108 Kenilworth Place, Brooklyn 11210;
- 11 East Hawthorne Avenue, Valley Stream 11580;
- 11118 Flatlands Avenue, Brooklyn 11207;
- 1122 Coney Island Avenue, Brooklyn, 11230;
- 1314 Coney Island Avenue, Brooklyn 11230;
- 137-42 Guy R Brewer Boulevard, Jamaica 11434;
- 175 Fulton Avenue, Hempstead 11550;
- 2115 Surf Avenue, Brooklyn 11224;
- 2422 Knapp Street, Brooklyn 11235;
- 245 Rockaway Avenue, Valley Stream 11580;
- 318 Seguine Avenue, Staten Island 10309;
- 420 Doughty Boulevard, Inwood 11096;
- 430 West Merrick Road, Valley Stream 11580;
- 458 Hempstead Turnpike, Elmont, 11003;
- 480 East Jericho Turnpike, Huntington Station 11746;
- 486 McDonald Avenue, Brooklyn 11218;
- 513 Church Avenue, Brooklyn 11218;
- 5223 9th Avenue, Brooklyn, 11220;
- 5506 Avenue N, Brooklyn 11234;
- 6506 Roosevelt Avenue, Woodside 11377;
- 71 South Central Avenue, Valley Stream 11580;
- 79-45 Metropolitan Avenue, Flushing 11379;
- 92-08 Jamaica Avenue, Queens 11421;
- 9208 Liberty Avenue, Ozone Park 11417; and
- 97-01 101st Avenue, Ozone Park 11416.

69.     In order to obtain access to the Clinics' patient base (i.e., Insureds), Kofman, with the assistance of the Management Defendants and on behalf of the Provider Defendants, entered into unlawful kickback and referral arrangements with individuals, including John Doe Defendants "1"-"10", who provided access to the patients who were treated, or who purported to be treated, at the Clinics.

70.     The Management Defendants thereafter created fraudulent "billing opportunities" for the Provider Defendants by ensuring that providers at the Clinics issued written referrals for the purpose of steering Insureds to the Provider Defendants for MRI services, without regard to whether such MRI services were medically necessary and to maximize profits without regard to genuine patient care.

71.     In an attempt to conceal their wrongdoing, Defendants exploited the provision of the Fee Schedule that allows a professional healthcare practice to separately report the professional component and technical component of MRIs, using that as a basis to submit separate billing for the Fraudulent Services through the Provider Defendants.

72.     Nevertheless, the Fraudulent Services billed under the names of the Provider Defendants were provided without any legitimate referral from a licensed professional and without any direction or supervision by a licensed professional regarding the nature, performance and quality of the technical services allegedly rendered by the Provider Defendants.

73.     To further conceal their wrongdoing, Defendants elected to bill for the Fraudulent Services through five separate entities with unique tax identification numbers – Akiva, Rashbi Diagnostics, I&A, HMS, and DS Medical – in order to limit the volume of bills submitted under a single tax identification number, in an attempt to avoid attracting the attention and scrutiny of the insurance industry to the volume of fraudulent billing originating from any one entity.

**B.      The Management Defendants Dictated and Controlled the Performance of the MRI Services**

74.     Kofman, with the assistance of the other Management Defendants and through the TC Defendants, dictated and controlled the performance of the Fraudulent Services, which were allegedly rendered at the following MRI facility locations: (i) 253-02 Rockaway Boulevard,

Rosedale (the "Rockaway Boulevard Location"); (ii) 2071 Clove Road, Staten Island (the "Clove Road Location"); and (iii) 1408 Ocean Avenue, Brooklyn (the "Ocean Avenue Location").

75.     In keeping with the fact that the Management Defendants operated and controlled these MRI facilities, the Provider Defendants did not market their respective "practices" to the general public, did not advertise for patients, did not engage in efforts to attract new referral sources, never sought to build name recognition to draw legitimate business, and did virtually nothing as would be expected of the owner of a legitimate radiology "practice" to develop their reputation and attract patients.

76.     Because the TC Defendants could not bill for the technical component without licensed healthcare professionals to perform the professional component of the Fraudulent Services, Kofman and the other Management Defendants sought physicians who were willing to: (i) bill for the professional component of the Fraudulent Services through a medical professional corporation under the physician's name; (ii) perform the professional component of the services remotely with no patient interaction or involvement in the day-to-day operations of the MRI facilities; (iii) routinely issue MRI reports that had multiple reported abnormal findings regardless of whether medically warranted; and (iv) submit large-scale billing to GEICO and other insurers.

77.     In exchange for the ability to immediately access the Management Defendants' and TC Defendants' patient base (*i.e.*, Insureds), which had been obtained pursuant to unlawful kickback and referral arrangements with individuals at the Clinics, the PC Owners entered into *quid pro quo* arrangements with the Management Defendants and TC Defendants. Pursuant to these agreements, in exchange for the opportunity to submit billing for the professional component of the Fraudulent Services, the PC Owners agreed to use the PC Defendants to perform their part of the

Fraudulent Services, have no involvement in the MRI facilities, and ensure the routine issuance of MRI reports with multiple abnormalities per Insured.

78.     Further, the PC Owners and PC Defendants had no role in selecting the MRI technologists, administrative staff, billing, collections, transportation, and/or other services. Rather, the Management Defendants, through the TC Defendants, controlled many of these functions for the PC Defendants. For example, the TC Defendants' administrative staff was responsible for whether Insureds signed AOB forms on behalf of the PC Defendants. Moreover, the PC Defendants were required to use the same software platform as TC Defendants, which allowed the TC Defendants to control the billing process and ensure that the MRI reports had "found" sufficient abnormalities prior to submitting the documents to the billing company on behalf of the PC Defendants.

79.     Further, neither PC Owners nor any radiologist from the PC Defendant were never present at any of the MRI facilities. The Management Defendants' physical presence at the MRI facilities, along with the absence of physical presence, oversight, or quality review by licensed radiologists, allowed the Management Defendants to control the performance of MRI services at the MRI facilities through MRI technologists and administrative staff they directed, without any genuine involvement by any licensed radiologists.

80.     With respect to the Rockaway Boulevard Location, Kofman, with the assistance of Rafailov and Modnyy, controlled the Rockaway Boulevard Location and the performance of MRI services through Rashbi Ventures and Rashbi Diagnostics. In that regard, Rashbi Ventures: (i) purchased the MRI machine from the imaging provider that previously operated at the location for approximately $35,000.00; and (ii) entered into a lease agreement with the landlord of the

Rockaway Boulevard Location for a monthly rent of just over $5,100.00 per month with small annual increases.

81.    In turn, to ostensibly create the appearance that it was paying for legitimate services, Rashbi Diagnostics regularly transferred funds electronically to Rashbi Ventures totaling between $10,000.00 to over $100,000.00 per month. In reality, the funds transferred to Rashbi Ventures were used to issue checks directly to Kofman, Rafailov, and Modnyy, which had the effect of concealing the true amounts paid Kofman, Rafailov, and Modnyy as a result of their control of the Rockaway Boulevard Location.

82.    In keeping with the fact that they controlled the performance of the MRI services at the Rockaway Boulevard Location, Kofman, Rafailov, and/or Modnyy, through Rashbi Diagnostics and Rashbi Ventures, hired and controlled the MRI technologists and administrative staff at the Rockaway Boulevard Location. Further, upon information and belief, no radiologist (or any physician) was ever present at the Rockaway Boulevard Location to oversee any aspect of the MRI services performed, ever exercised any supervision over the MRI technologists or other staff, or ever ensured that the MRI machine was properly maintained and produced images sufficient to meet the standard of care.

83.    Similarly, Kofman, with the assistance of Rafailov, A. Miller, and Mizrahi, through I&A, controlled the performance of the MRI services at the Clove Road Location. To begin operating at that location, I&A entered into a lease agreement to use the premises and MRI machine at an existing MRI facility. To create the false appearance that a physician oversaw the performance of the Fraudulent Services, I&A submitted billing to GEICO that falsely listing the name of an "M.D." as having performed the service. In reality, the person I&A listed as a physician

was an MRI technologist hired and controlled by I&A and the above-referenced Management Defendants.

84.     Like at the Rockaway Boulevard Location, upon information and belief, no radiologist (or any physician) was ever present at the Clove Road Location to oversee any aspect of the MRI services performed, ever exercised any supervision over the MRI technologists or other staff, or ever ensured that the MRI machine was properly maintained and produced images sufficient to meet the standard of care.

85.     Lastly, Kofman, with the assistance of Modnyy and Mizrahi, through Akiva, controlled the performance of the MRI services at the Ocean Avenue Location. Unlike the other two MRI facilities, Akiva did not enter into a lease agreement to use the premises and the MRI machine. Instead, Akiva entered into an agreement with an existing MRI facility whereby it paid operator of the MRI facility a fee "per scan" rendered and in exchange an MRI technologist employed by the MRI facility would perform the MRI scan.

86.     In other words, no employee of Akiva even rendered the technical component of the Fraudulent Services to any Insured.  Rather, Akiva paid a "per scan" fee so it could bill for MRI services that were, in reality, performed by another entity.

87.     In sum, the Management Defendants, through the TC Defendants and Rashbi Ventures, controlled the above-referenced MRI facilities and such control would not have been possible without: (i) the recruitment of and *quid pro quo* arrangements with the PC Owners and PC Defendants; and (ii) the unlawful kickback and referral arrangements with individuals at the Clinics, which provided the Management Defendants with a steady flow of patients (*i.e.*, billing opportunities) on which to perform the Fraudulent Services.

### C.     The Unlawful kickback and Referral Arrangements

88.     As part and parcel of the fraudulent scheme, the Management Defendants created, maintained, and controlled the referral sources and the patient base for the Provider Defendants.

89.     As such, the Management Defendants required the Provider Defendants to use the referral sources at the Clinics with which the Management Defendants maintained illicit kickback and referral arrangements.

90.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

91.     At many of the locations, unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

92.     These Clinics were also a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

93.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

94.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1122 Coney Island, Brooklyn from a "revolving door" of more than 100 different healthcare services providers.

95.     Additionally, GEICO has received billing for purported healthcare services rendered at the Clinic located at 513 Church Avenue, Brooklyn from a "revolving door" of more than 60 different healthcare services providers.

96.     Additionally, GEICO has received billing for purported healthcare services rendered at the Clinic located at 108 Kenilworth Avenue, Brooklyn from a "revolving door" of more than 40 different healthcare services providers.

97.     Notably, many of the providers at the Clinics who steered MRI referrals to the Provider Defendants have been the subject of investigations and lawsuits commenced by various New York insurers regarding fraudulent billing and treatment practices, including unlawful kickback and referral schemes that led to excessive, fraudulent treatment and billing for the purpose of generating profits without regard to patient care.

98.     For example, one of the primary sources of MRI referrals to the Provider Defendants included healthcare professionals who work at Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical"), which is owned by Jonathan Landow, M.D. ("Dr. Landow").  Dr. Landow and several of his professional corporations were sued by GEICO for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in unlawful kickback and referral arrangements. See Government Employees Ins. Co. et al v. Landow, et al, 1:21-cv-01440 (NGG)(RER)(E.D.N.Y. 2021).

25

99.     In addition, and in keeping with the fact that unlicensed laypersons controlled many of the Clinics and that the Defendants paid unlawful kickbacks in exchange for patient referrals, GEICO has identified in a series of related investigations that a group of unlicensed laypersons combined to misappropriate and illegally use the name, New York license, signature and other relevant information of healthcare professionals based out of Maryland, New York and Missouri to bill GEICO for services purportedly performed at several locations, including: (i) 102-34 Atlantic Avenue, Ozone Park; (ii) 108 Kenilworth, Brooklyn; (iii) 137-42 Guy Brewer Boulevard, Jamaica; (iv) 175 Fulton Avenue, Hempstead; (v) 430 West Merrick Road, Valley Stream; (vi) 79-45 Metropolitan Avenue, Flushing; (vii) 92-08 Jamaica Avenue, Queens; and (viii) 97-01 101st Avenue, Ozone Park.  See Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-03598 (BMC)(E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-06187(KAM)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Susan J. Polino PhD., et al., Dkt. No. 1:22-cv-05178(ARR)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Poonawala, et al., Dkt. No. 1:22-cv-03063(PKC)(VMS) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Bily-Linder, et al., Dkt. No. 1:23-cv-00515(FB)(RML) (E.D.N.Y.).

100.    In order to obtain access to the Clinics' patient base (i.e., Insureds) and create fraudulent "billing opportunities" for healthcare services, the Management Defendants, on behalf of the Provider Defendants, entered into unlawful kickback and referral arrangements with individuals, including John Doe Defendants "1"-"10", who "brokered" or "controlled" access to patients who were treated, or who were purported to be treated, at the Clinics.

101.    The Clinics willingly provided access to Insureds to the Provider Defendants in exchange for kickbacks because the Clinics were facilities that sought to profit from the

"treatment" of individuals covered by No-Fault insurance and therefore catered to high volumes of Insureds at the locations.

102.   The financial arrangements into which the Management Defendants and the Provider Defendants entered included the payment of fees for ostensibly legitimate services.

103.   However, the financial arrangements into which the Management Defendants entered into on behalf of the Provider Defendants were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the Provider Defendants for medically unnecessary services at the Clinics.

104.   In further keeping with the fact that the payments made by the Management Defendants and the Provider Defendants were actually disguised kickbacks in exchange for patient referrals, the PC Owners and the PC Defendants had never marketed their services to the Clinics, had no relationship with any of the providers at the Clinics, and, in fact, rarely if ever even knew the names of the referring providers.

105.   The Management Defendants made the various kickback payments in exchange for having Insureds referred to the Provider Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

106.   The amount of kickbacks paid by the Management Defendants generally was based on the volume of Insureds that were steered to the Provider Defendants for the purported medically unnecessary services.

107.   As a result of the kickback and referral arrangements, the Insureds were simply directed by the Clinics to the MRI facilities, and the unlicensed persons associated therewith, to subject themselves to the Fraudulent Services by whatever technician was working for the Provider

Defendants that day, because of the kickbacks paid by the Management Defendants on behalf of the Provider Defendants.

108.    The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

109.    In fact, as a result of the unlawful financial arrangements, the Provider Defendants were able to submit more than $1.7 million in fraudulent billing to GEICO for the medically useless services.

110.    At all times the Defendants knew that the kickback and referral arrangements were unlawful and therefore, took affirmative steps to conceal the existence of the fraudulent scheme.

111.    In fact, Defendants split the billing for the Fraudulent Services across multiple entities in order to limit the amount of billing submitted by each Provider Defendant.

112.    Defendants conducted their scheme through multiple entities using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

### D.    Defendants' Fraudulent Charges for MRIs

113.    The Management Defendants—who were unbound by the ethical rules governing the quality of care and the rules protecting against the exploitation of the patients for financial gain—designed and, with the assistance of the Provider Defendants, implemented predetermined protocols that served to justify the Provider Defendants' billing for the Fraudulent Services and to

satisfy their unlawful kickback and referral arrangements, all without regard to whether any of the Provider Defendants' MRI services were medically necessary.

114.   The Provider Defendants' ability to bill GEICO and other automobile insurers for the Fraudulent Services depended upon their ability to gain access to Insureds.

115.   As part of Defendants' unlawful kickback and referral arrangements, individuals associated with the Clinics issued referrals to the Provider Defendants for performance of the MRI services regardless of whether they were medically necessary to treat the injuries the Insureds allegedly suffered in the underlying automobile accidents.

116.   In the claims identified in Exhibits "1" through "6," the substantial majority of the Insureds had been involved in relatively minor, low-speed, low-impact "fender-bender" accidents.

117.   In keeping with the fact that the Insureds within the claims identified in Exhibits "1" through "6" typically were involved in only minor accidents, in many of the claims identified in Exhibits "1" through "6" the Insureds did not seek treatment at any hospital after their minor accidents.

118.   To the extent that the Insureds in the claims identified in Exhibits "1" through "6" did seek treatment at a hospital as a result of their accidents, they virtually always were briefly observed on an outpatient basis and then discharged the same day with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

119.   Because the Defendants' scheme was designed to bill for the Fraudulent Services regardless of the fact that these types of minor injuries generally do not warrant the performance of MRI services, the Provider Defendants misinterpreted the nature, extent, and results of the MRIs by submitting bills to GEICO with MRI reports that virtually always contained: (i) fictitious clinical histories; and/or (ii) at least one MRI study per Insured with multiple reported abnormal

"findings" when, in reality, those "findings" were fabricated and/or grossly exaggerated. The Defendants did so in order to provide a false justification for their performance of the MRI services and to make it appear as if the Insureds had suffered serious injuries as the result of their typically minor automobile accidents, when in fact they had not.

1.      **The Provider Defendants' Fictitious Clinical Histories**

120.    Pursuant to the prevailing standards of medical care, referring healthcare providers are required to provide a clinical history to the radiology provider when referring patients for MRI services.

121.    In a legitimate clinical setting, radiology providers have a duty to review patient clinical histories and patient intake forms in order to determine, based on their independent medical judgment, whether referrals for radiology services are supported by valid medical justifications.

122.    In contravention of the prevailing standards of medical care, the Provider Defendants performed the Fraudulent Services either: (i) despite the fact that no clinical history or reason for referral had been provided by the referring healthcare provider; and/or (ii) without reviewing the Insured's clinical history or patient intake forms, even when a clinical history or reason for referral was provided.

123.    In virtually all of the claims at issue, Provider Defendants performed MRI services pursuant to written MRI referrals that were issued on virtually identical templated MRI referral forms, which contained a section entitled "CLINICAL HISTORY & REASON FOR STUDY." In the Provider Defendants' claim submissions to GEICO, this section of the MRI referral forms was frequently blank.

124.     Even though no clinical history or reason for referral was provided on these MRI referral forms, the referring healthcare providers at the Clinics nevertheless checked off or circled the body parts on which to perform MRI studies.

125.     Despite the fact that no clinical history or reason for referral was provided, the MRI reports generated by the PC Defendants contained boilerplate, fictitious clinical histories to make it appear as if the referring healthcare provider had provided a legitimate reason for performance of the MRI, when in fact no such clinical history was provided.

126.     As a representative example, on April 5, 2023, Akiva Imaging and HMS purported to perform cervical spine and right knee MRI studies for Insured A.A. The MRI referral form for A.A.'s MRI studies did not provide any clinical history or reason for the referral, as shown in the following excerpt:



127.     Despite the fact that the MRI referral form for Insured A.A. contained no clinical history or reason for the referral, HMS's MRI reports for A.A.'s cervical spine and right knee MRI studies contained fictitious clinical histories, stating that A.A. had "neck pain with upper extremity radiculopathy" on the cervical study and "pain with decreased range of motion" on the right knee study, as demonstrated in the following MRI report excerpts:



206611228    A█ A█████        MR    C-SPINE...        view    2023-04-05

**CLINICAL INDICATION:**
MVA, neck pain with upper extremity radiculopathy.



206611229    A█ A█████        MR    RT-KNEE...        view    2023-04-05

**CLINICAL INDICATION:**
MVA, pain with decreased range of motion.

128.    This is only a representative example.

129.    In virtually all of the claims submitted by Defendants to GEICO seeking reimbursement for the Fraudulent Services where no clinical history or reason for referral was provided, the PC Defendants' MRI reports contained boilerplate, fictitious clinical histories.

130.    The Provider Defendants generated MRI reports with fictitious clinical histories to create the false appearance that there was a legitimate reason for performance of the MRI studies, when in fact there was none.

131.    In keeping with the fact that the Provider Defendants performed the Fraudulent Services pursuant to predetermined protocols, the MRI reports generated by Provider Defendants contained boilerplate, fictitious patient histories even when a clinical history and reason for the MRI referral was provided on the MRI referral form.

132.    As a representative example, on January 9, 2024, I&A Imaging and DS Medical purported to perform lumbar spine and right thigh MRI studies for Insured J.E. The MRI referral

form for J.E.'s MRI studies provided a clinical history or reason for the referral of "r/o disc

herniation" and "r/o hamstring tear," as shown in the following excerpt:



133.   Despite the fact that the MRI referral form for Insured J.E. contained a clinical

history and reason for the referral, DS Medical's MRI reports for J.E.'s lumbar spine and right

thigh MRI studies contained boilerplate, fictitious clinical histories, stating that the clinical

indications for the MRI studies were "lower back pain and radiculopathy" on the lumbar study and

"radiculopathy and potential arthropathy" on the right thigh study, as demonstrated in the

following MRI report excerpts:

**DS MEDICAL**
DIAGNOSTICS PC

| | | | |
|---|---|---|---|
| **PATIENT ID:** | 426 | **DATE OF BIRTH:** |  |
| **PATIENT:** | E█████, J█████ | **AGE / SEX:** | M |
| **DATE OF EXAM:** | 01/09/2024 | **ORDERED BY:** | -- -- |
| **Study:** | L-SPINE | | |

MRI lumbar spine without IV contrast

Indication: Status post accident/trauma, lower back pain and radiculopathy

33



**DS MEDICAL
DIAGNOSTICS PC**

| | | | |
|---|---|---|---|
| **PATIENT ID:** | 426 | **DATE OF BIRTH:** |  |
| **PATIENT:** | E████, J██ | **AGE / SEX:** | M |
| **DATE OF EXAM:** | 01/09/2024 | **ORDERED BY:** | -- -- |
| **Study:** | RT-THIGH | | |

MRI right hip without IV contrast

Indication: Status post MVA/trauma, pain, radiculopathy and potential arthropathy

134.    This is only a representative example.

135.    In virtually all of the claims submitted by Defendants to GEICO seeking reimbursement for the Fraudulent Services where a clinical history or reason for referral was provided by the referring healthcare provider, the PC Defendants' MRI reports contained boilerplate, fictitious clinical histories that were often substantially different from the clinical history or reason for referral that was provided by the referring healthcare provider.

136.    Similarly, in keeping with the facts that the Fraudulent Services were performed pursuant to predetermined protocols without regard to medical necessity or genuine patient care, Provider Defendants did not review the patient intake forms that Insureds allegedly filled out prior to the performance of the MRI services by Provider Defendants.

137.    The patient intake forms submitted by the Provider Defendants asked patients to provide information regarding their injuries.

138.    Underscoring that the clinical histories in the PC Defendants' MRI reports were fictitious, the patient intake forms that Provider Defendants submitted to GEICO were frequently

either blank or contained information that contradicted the fictitious clinical histories listed in the PC Defendants' MRI reports.

### 2. The Provider Defendants' Fabricated and/or Grossly Exaggerated "Findings"

139.    As part of the Defendants' fraudulent scheme, the MRI services performed by Provider Defendants resulted in the issuance of MRI reports from the PC Defendants that "found" multiple abnormalities for nearly every Insured. This was true regardless of the Insureds presenting symptoms or individual circumstances.

140.    The excessive reporting of multiple abnormalities for almost every Insured is highly improbable where the Insureds were typically involved in relatively minor vehicular accidents.

141.    Upon information and belief, the MRI report "findings" were often fabricated and/or grossly exaggerated as a result of the unlawful kickback and referral arrangements with the Clinics, which had a vested interest in obtaining MRI reports that could justify the performance of additional medically unnecessary services by providers at the Clinics.

142.    In keeping with the fact that the MRI report "findings" were often fabricated and/or grossly exaggerated, many of the Insureds were referred to the Provider Defendants for multiple MRI studies. Although extremely improbable in a legitimate patient cohort, the MRI reports for these Insureds contained abnormal "findings" across multiple studies, including findings that are rarely seen in legitimate clinical practice, such as meniscus tears in both knees, multiple cervical and lumbar disc herniations, and disc herniations at consecutive spinal levels.

143.    For example:

- Patient WD received a cervical, lumbar, and left knee MRIs from Shaare and DS Medical. The MRI report issued by DS Medical for this patient "found," among other things: (i) for the cervical spine, disc herniations at four consecutive spinal levels: C3-C4, C4-C5, C5-C6, and C6-C7; (ii) for the lumbar spine, disc herniations at five consecutive spinal levels: T12-L1, L1-L2, L2-L3, L3-L4, and L4-L5; and (iii) for the left knee MRI, tears of medial and lateral

menisci, partial tears of the medial and lateral collateral ligament, and a rupture of the anterior cruciate ligament,

- Patient CE received right knee, left shoulder, cervical, and lumbar MRIs from Rashbi Diagnostics and HMS. The MRI reports issued by HMS for this patient "found," among other things: (i) for the right knee, tears of the posterior horns of the medial and lateral menisci; (ii) for the left shoulder, rotator cuff tendinopathy and bursitis; (iii) for the cervical spine, disc herniations at consecutive spinal levels of C5-C6 and C6-C7; and (iv) for the lumbar spine, a disc herniation at L5-S1.

- Patient NA received cervical spine, lumbar spine, left shoulder, and right shoulder MRIs from Rashbi Diagnostics and HMS. The MRI reports issued by HMS for this patient "found," among other things: (i) for the cervical spine, disc herniations at C3-C4 and at consecutive spinal levels of C5-C6 and C6-C7; (ii) for the lumbar spine, a disc herniation at L4-L5; (iii) for the left shoulder, a partial supraspinatus rotator cuff tendon tear with tendinopathy and bursitis; and (iv) for the right shoulder, a partial infraspinatus tendon tear with rotator cuff tendinopathy and bursitis.

- Patient CL received cervical spine and lumbar spine MRIs from Rashbi Diagnostics and HMS. The MRI reports issued by HMS for this patient "found," among other things: (i) for the cervical spine, disc herniations at consecutive spinal levels of C3-C4 and C4-C5; and (ii) for the lumbar spine, a disc herniation at L5-S1.

- Patient SS received right knee, left knee, right hip, and right shoulder MRIs from Rashbi Diagnostics and HMS. While the right hip MRI was negative, the remaining MRI reports issued by HMS for this patient "found," among other things,: (i) for both right and left knee, tears of the posterior horn of the medial meniscus with joint effusion; and (ii) for the right shoulder, a supraspinatus rotator cuff tendon tear with joint effusion, tendinopathy, and bursitis.

- Patient ID received cervical and right knee MRIs from Rashbi Diagnostics and HMS. The MRI reports issued by HMS for this patient "found," among other things: (i) for the cervical spine, disc herniations at three consecutive spinal levels: C3-C4, C4-C5, and C5-C6; and (ii) for the right knee, tears of the posterior horn of the medial and lateral menisci.

- Patient EA received cervical and lumbar MRIs from Akiva and HMS. The MRI reports issued by HMS for this patient "found," among other things: (i) for the cervical spine, disc herniations at consecutive spinal levels of C5-C6 and C6-C7; and (ii) for the lumbar spine, disc herniations at four consecutive spinal levels: L2-L3, L3-L4, L4-L5, and L5-S1.

- Patient ZC received lumbar and right shoulder MRIs from Akiva and DS Medical. The MRI reports issued by DS Medical for this patient "found," among other things: (i) for the lumbar spine, disc bulging at L5-S1; and; and (ii) for the right shoulder, partial tear of the supraspinatus rotator cuff tendon with tendinitis and bursitis.

- Patient FP received a cervical MRI from I&A and DS Medical. The MRI report issued by DS Medical for this patient "found," among other things, abnormalities at five consecutive spinal levels: disc protrusions at C2-C3, C3-4, C4-5, a disc osteophyte at C5-6, and a disc bulge at C6-C7.

- Patient AF received cervical and lumbar MRIs from I&A and DS Medical. The MRI reports issued by DS Medical for this patient "found," among other things: (i) for the cervical spine, disc bulges at two consecutive spinal levels: C4-C5 and C5-C6; and (ii) for the lumbar spine, disc bulges at two consecutive spinal levels: L4-L5 and L5-S1.

- Patient CH received cervical and lumbar MRIs from Shaare and DS Medical. The MRI reports issued by DS Medical for this patient "found," among other things: (i) for the cervical spine, disc herniations at four consecutive spinal levels: C3-C4, C4-C5, C5-C6, and C6-C7; and (ii) for the lumbar spine, a disc herniation at L5-S1 and a disc bulge at L4-L5.

144. These are only representative examples. In many of the claims submitted by Defendants to GEICO seeking reimbursement for the Fraudulent Services, the MRI reports contained numerous abnormal "findings" in multiple MRI studies, including highly improbable findings that are rarely seen in clinical practice.

145. Moreover, in keeping with the fact that the Fraudulent Services were performed pursuant to predetermined protocols designed to justify further treatment at the Clinics, virtually all of the PC Defendants' MRI reports presume that the findings are traumatic and were directly caused by a motor vehicle accident, even when there are indications that the injuries pre-date the Insured's motor vehicle accident.

146. For example, a substantial number of the PC Defendants' MRI reports purport to "find" tendon tears in the shoulder and knee without any joint effusion, which suggests that the tendon tears are chronic—i.e., not caused by a recent accident.

147.    In such cases, a legitimate radiologist following the prevailing standards of care would comment on the chronicity of such injuries in their MRI reports.

148.    PC Defendants' MRI reports virtually never made any comment on the chronicity of the injuries in any of their MRI reports, ostensibly because doing so would undercut the ability of healthcare providers at the Clinics to obtain no-fault reimbursement for further treatments to Insureds, which in turn would jeopardize the Provider Defendants' access to patient referrals originating from the Clinics.

**E.    The Billing for Radiology Services in Violation of Ground Rule 7**

149.    In further support that the Management Defendants controlled and dictated the performance of the Fraudulent Services, bills submitted by the Provider Defendants to GEICO for the Fraudulent Services purportedly performed by the PC Defendants violated Section 7 of the Ground Rules established by the Radiology Section of the Fee Schedule. Specifically, Section 7 provides:

> 7.  **Necessity of Services or Procedures**
>
> When a patient is referred to radiologists or other specialist for services covered in the Radiology section, they shall evaluate the patient's problem and determine if the services or procedures are medically necessary. Such evaluation and necessary consultation with the referring physician is an integral part of the professional component relative value unit and does not merit any additional charges.

150.    When an Insured was referred to the PC Defendants for the Fraudulent Services, no physician from the PC Defendants evaluated the patient's problem to determine if the services or procedures were medically necessary, and no consultation with the referring healthcare provider was performed and no doctor from the PC Defendants was present to supervise the technicians that performed the MRIs, all in violation of the Radiology Ground Rules.

151.    Indeed, neither the PC Owners nor any physician associated with PC Defendants visited the MRI facilities and, as a result, did not perform independent consultations of patients or meaningfully oversee the technicians performing the services. In fact – and in violation of Section 7 – the PC Owners and the physicians associated with the PC Defendants never evaluated the patient's problems, consulted with the referring provider, or saw the patient in person with respect to any of the MRI services at issue.

152.    Had the PC Owners been legitimate MRI providers and had not ceded control of the performance of the PC Defendants' MRI services to the Management Defendants then the PC Owners and/or the PC Defendants' radiologist employees would have been present at the MRI facilities on a frequent basis, would have provided genuine professional oversight of the MRI facilities, and would have been in a position to either abide by or direct another physician to abide by the requirements of Section 7 of the rules established by the Radiology Section of the Fee Schedule.

### F.    The Defendants' Use of Independent Contractors

153.    Defendants' fraudulent scheme also included the submission of claims to GEICO using Provider Defendants seeking payment for services provided by individuals that were never employed by them, in violation of New York law.

154.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors -- the healthcare services must be provided by the billing provider itself, or by its employees.

155.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the

New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

156.    For example, Akiva purported to perform MRI services at the Ocean Avenue Location and falsely represented that Oleg Maleev ("Maleev"), a technician, was the individual who performed the services as an employee of Akiva.

157.    In reality, Maleev was an employee of another MRI provider that operated out of the Ocean Avenue Location.

158.    This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if the Akiva bills accurately represented the fact that the technician who performed the service was not an employee of Akiva.

159.    Upon information and belief, several of the individuals, including the reading radiologists, who purportedly performed the Fraudulent Services on behalf of the Provider

Defendants did not have a bona-fide employer/employee relationship with the Provider Defendants, as they worked simultaneously for several other healthcare providers at the same time as the Provider Defendants.

160. By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

161. Because many of the Fraudulent Services were performed by individuals not employed by Provider Defendants, the Provider Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for those Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

**III.   The Fraudulent Billing the Defendants Submitted and Caused to be Submitted to GEICO**

162. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports

through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

163.    The billing forms (i.e.,  NF-3 and/or HCFA-1500 forms) and treatment reports submitted to GEICO by and on behalf of the Provider Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresent to GEICO that the Provider Defendants are in compliance with material licensing laws, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants are not in compliance with material licensing laws because the Fraudulent Services were provided pursuant to the direction of the Management Defendants, who are not licensed medical professionals, and pursuant to unlawful *quid pro quo*, kickback, and referral arrangements;

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly misrepresent to GEICO that the Provider Defendants are in compliance with the New York State Workers' Compensation Fee Schedule; and

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Providers Defendants misrepresented to GEICO that the Provider Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that allegedly were performed by employees of Provider Defendants. In fact, in many cases, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services because they were provided by independent contractors.

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

164.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

165.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

166.    Specifically, the Defendants knowingly misrepresented and concealed facts related to their relationship as part of an integrated scheme, by purporting to operate the Provider Defendants as separate entities, and further, concealed their collusive relationships with the Clinics to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

167.    Further, the Defendants entered into complex financial arrangements that were designed to – and did – conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

168.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and provided, to the extent provided at all, pursuant to predetermined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly received the Fraudulent Services.

169.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

170.    The Defendants' ongoing collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, are an essential part of the fraudulent scheme since Defendants know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the New York metropolitan area.

171.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

172.    The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $665,000.00 based upon the fraudulent charges.

173.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
**Against all Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

174.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

175.    There is an actual case in controversy between GEICO, the Provider Defendants and the Owner Defendants regarding more than $1.8 million in pending fraudulent No-Fault billing for the Fraudulent Services that have been submitted to GEICO under the name of the Provider Defendants.

176.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants provided the Fraudulent Services pursuant to the dictates of laypersons not licensed to render healthcare services.

177.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants provided the Fraudulent Services as a result of unlawful *quid pro quo*, kickback, and referral arrangements.

178.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants provided the Fraudulent Services pursuant to predetermined protocols, without regard to whether the Fraudulent Services were medically necessary, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings."

179.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants billed for the Fraudulent Services in violation of the requirements in the New York State Workers' Compensation Fee Schedule.

180.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were provided by independent contractors, not the Provider Defendants' employees.

181.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of any of the Provider Defendants.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Kofman, Rashbi Ventures, Rafailov, and Modnyy**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

182.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

183.    Rashbi Diagnostics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

184.   Kofman, Rashbi Ventures, Rafailov, and Modnyy knowingly have conducted and/or participated, directly or indirectly, in the conduct of Rashbi Diagnostics's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Rashbi Diagnostics was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements; (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

185.   Rashbi Diagnostics's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular ways in which Kofman, Rashbi Ventures, Rafailov, and Modnyy operated Rashbi Diagnostics, inasmuch as Rashbi Diagnostics never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Rashbi Diagnostics to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Rashbi Diagnostics has

not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through Rashbi Diagnostics to the present day.

186.     Rashbi Diagnostics is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.   These inherently unlawful acts are taken by Rashbi Diagnostics in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

187.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $104,000.00 pursuant to the fraudulent bills submitted by the Defendants through Rashbi Diagnostics.

188.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Kofman, Rashbi Ventures, Rafailov, Modnyy, and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

189.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

190.     Rashbi Diagnostics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

191.     Kofman, Rashbi Ventures, Rafailov, Modnyy, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Rashbi Diagnostics's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges

seeking payments that Rashbi Diagnostics was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

192.    Kofman, Rashbi Ventures, Rafailov, Modnyy, and John Doe Defendants "1"-"10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

193.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $104,000.00 pursuant to the fraudulent bills submitted by Defendants through Rashbi Diagnostics.

194.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION

**Against Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics**
**(Common Law Fraud)**

195.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

196.    Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

197.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider

Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

198.    Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rashbi Diagnostics that were not compensable under the No-Fault Laws.

199.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $104,000.00 pursuant to the fraudulent billing submitted by Defendants.

200.    The extensive fraudulent conduct by Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

201.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Against Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics**
**(Unjust Enrichment)**

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

203.    As set forth above, Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

204.     When GEICO paid the bills and charges submitted by or on behalf of Rashbi Diagnostics for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

205.     Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

206.     Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

207.     By reason of the above, Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics have been unjustly enriched in an amount to be determined at trial, but in no event less than $104,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

208.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

209.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics.

210.     The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to Rashbi Diagnostics in exchange for unlawful kickbacks.

211.   The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Rashbi Diagnostics to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through Rashbi Diagnostics.

212.   John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Rashbi Diagnostics for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

213.   The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $104,000.00 pursuant to the fraudulent bills submitted through Rashbi Diagnostics.

214.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

215.   Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Kofman, Modnyy, and Mizrahi
### (Violation of RICO, 18 U.S.C. § 1962(c))

216.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

217.    Akiva  is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

218.    Kofman, Modnyy, and Mizrahi knowingly have conducted and/or participated, directly or indirectly, in the conduct of Akiva's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Akiva was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

219.    Akiva's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular ways in which Kofman, Modnyy, and Mizrahi operated Akiva, inasmuch as Akiva never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Akiva to function.  Furthermore, the intricate planning required to carry out and

conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Akiva has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through Akiva to the present day.

220.    Akiva is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Akiva in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

221.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted by the Defendants through Akiva.

222.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR AN EIGHT CAUSE OF ACTION**
**Against Kofman, Modnyy, Mizrahi, and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

223.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

224.    Akiva is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

225.    Kofman, Modnyy, Mizrahi, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Akiva's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit

or cause to be submitted hundreds of fraudulent charges seeking payments that Akiva was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

226.    Kofman, Modnyy, Mizrahi, and John Doe Defendants "1"-"10"  knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

227.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted by Defendants through Akiva.

228.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Kofman, Modnyy, Mizrahi, and Akiva**

**(Common Law Fraud)**

229.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

230.    Kofman, Modnyy, Mizrahi, and Akiva intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

231.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider

Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

232.  Kofman, Modnyy, Mizrahi, and Akiva intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Akiva that were not compensable under the No-Fault Laws.

233.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent billing submitted by Defendants.

234.  The extensive fraudulent conduct by Kofman, Modnyy, Mizrahi, and Akiva demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

235.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TENTH CAUSE OF ACTION**
**Against Kofman, Modnyy, Mizrahi, and Akiva**
**(Unjust Enrichment)**

236.  GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

237.  As set forth above, Kofman, Modnyy, Mizrahi, and Akiva have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

238.  When GEICO paid the bills and charges submitted by or on behalf of Akiva for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

239.     Kofman, Modnyy, Mizrahi, and Akiva have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, Modnyy, Mizrahi, and Akiva voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

240.     Kofman, Modnyy, Mizrahi, and Akiva's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

241.     By reason of the above, Kofman, Modnyy, Mizrahi, and Akiva have been unjustly enriched in an amount to be determined at trial, but in no event less than $15,000.00.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

242.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

243.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, Modnyy, Mizrahi, and Akiva.

244.     The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to Akiva in exchange for unlawful kickbacks.

245.     The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Akiva to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through Akiva.

246.     John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Akiva for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

247.     The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $15,000.00 pursuant to the fraudulent bills submitted through Akiva.

248.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

249.     Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**Against Kofman, Rafailov, A. Miller, and Mizrahi**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

250.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

251.     I&A is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

252.     Kofman, Rafailov, A. Miller, and Mizrahi knowingly have conducted and/or participated, directly or indirectly, in the conduct of I&A's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that I&A was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed

laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

253.    I&A's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular ways in which Kofman, Rafailov, A. Miller, and Mizrahi operated I&A, inasmuch as I&A never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for I&A to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that I&A has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through I&A to the present day.

254.    I&A is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by I&A in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

255.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $37,000.00 pursuant to the fraudulent bills submitted by the Defendants through I&A.

256.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Against Kofman, Rafailov, A. Miller, Mizrahi, and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

257.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

258.    I&A is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

259.    Kofman, Rafailov, A. Miller, Mizrahi, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of I&A's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that I&A was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all

to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

260.    Kofman, Rafailov, A. Miller, Mizrahi, and John Doe Defendants "1"-"10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

261.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $37,000.00 pursuant to the fraudulent bills submitted by Defendants through I&A.

262.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Against Kofman, Rafailov, A. Miller, Mizrahi, and I&A**
**(Common Law Fraud)**

263.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

264.    Kofman, Rafailov, A. Miller, Mizrahi, and I&A intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

265. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

266. Kofman, Rafailov, A. Miller, Mizrahi, and I&A intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through I&A that were not compensable under the No-Fault Laws.

267.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $37,000.00 pursuant to the fraudulent billing submitted by Defendants.

268.     The extensive fraudulent conduct by Kofman, Rafailov, A. Miller, Mizrahi, and I&A demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

269.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**Against Kofman, Rafailov, A. Miller, Mizrahi, and I&A**
**(Unjust Enrichment)**

270.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

271.     As set forth above, Kofman, Rafailov, A. Miller, Mizrahi, and I&A have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

272.     When GEICO paid the bills and charges submitted by or on behalf of I&A for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

273.     Kofman, Rafailov, A. Miller, Mizrahi, and I&A have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, Rafailov, A. Miller, Mizrahi, and I&A voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

274.     Kofman, Rafailov, A. Miller, Mizrahi, and I&A's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

275.     By reason of the above, Kofman, Rafailov, A. Miller, Mizrahi, and I&A have been unjustly enriched in an amount to be determined at trial, but in no event less than $37,000.00.

**AS AND FOR A SIXTEENTH CAUSE OF ACTION**
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

276.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

277.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, Rafailov, A. Miller, Mizrahi, and I&A.

278.     The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to I&A in exchange for unlawful kickbacks.

279.     The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for I&A to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through I&A.

280.     John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to I&A for medically unnecessary,

illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

281.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $37,000.00 pursuant to the fraudulent bills submitted through I&A.

282.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

283.    Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Against Kofman and H. Miller
### (Violation of RICO, 18 U.S.C. § 1962(c))

284.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

285.    HMS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

286.    Kofman and H. Miller knowingly have conducted and/or participated, directly or indirectly, in the conduct of HMS's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that HMS was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant

to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

287.     HMS's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular ways in which Kofman and H. Miller operated HMS, inasmuch as HMS never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for HMS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that HMS has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through HMS to the present day.

288.     HMS is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by HMS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

289.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000.00 pursuant to the fraudulent bills submitted by the Defendants through HMS.

290.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR AN EIGHTEENTH CAUSE OF ACTION**
**Against Kofman, H. Miller, and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

291.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

292.    HMS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

293.    Kofman, H. Miller, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of HMS's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that HMS was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise,

68

in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

294.   Kofman, H. Miller, and John Doe Defendants "1"-"10"  knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

295.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000.00 pursuant to the fraudulent bills submitted by Defendants through HMS.

296.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A NINTEENTH CAUSE OF ACTION
### Against Kofman, H. Miller, and HMS
### (Common Law Fraud)

297.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

298.   Kofman, H. Miller, and HMS intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

299.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were

provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

300.    Kofman, H. Miller, and HMS intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HMS that were not compensable under the No-Fault Laws.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000.00 pursuant to the fraudulent billing submitted by Defendants.

302.    The extensive fraudulent conduct by Kofman, H. Miller, and HMS demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

303.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**Against Kofman, H. Miller, and HMS**
**(Unjust Enrichment)**

304.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

305.    As set forth above, Kofman, H. Miller, and HMS have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

306.    When GEICO paid the bills and charges submitted by or on behalf of HMS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

307.    Kofman, H. Miller, and HMS have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, H. Miller, and HMS voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

308.    Kofman, H. Miller, and HMS's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

309.    By reason of the above, Kofman, H. Miller, and HMS have been unjustly enriched in an amount to be determined at trial, but in no event less than $6,000.00.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

311.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, H. Miller, and HMS.

312.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to HMS in exchange for unlawful kickbacks.

313.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for HMS to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through HMS.

314.    John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to HMS for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

315.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $6,000.00 pursuant to the fraudulent bills submitted through HMS.

316.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317.    Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### Against Kofman and Shifteh
### (Violation of RICO, 18 U.S.C. § 1962(c))

318.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

319.     DS Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

320.     Kofman and Shifteh knowingly have conducted and/or participated, directly or indirectly, in the conduct of DS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that DS Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

321.    DS Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular ways in which Kofman and Shifteh operated DS Medical, inasmuch as DS Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for DS Medical to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that DS Medical has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through DS Medical to the present day.

322.    DS Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by DS Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

323.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $246,000.00 pursuant to the fraudulent bills submitted by the Defendants through DS Medical.

324.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
**Against Kofman, Shifteh and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

325.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

74

326.     DS Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

327.     Kofman, Shifteh, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of DS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that DS Medical was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

328.     Kofman, Shifteh, and John Doe Defendants "1"-"10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

329.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $246,000.00 pursuant to the fraudulent bills submitted by Defendants through DS Medical.

330.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
**Against Kofman, Shifteh, and DS Medical**
**(Common Law Fraud)**

331.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

332.   Kofman, Shifteh, and DS Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

333.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent

Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

334.    Kofman, Shifteh, and DS Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DS Medical that were not compensable under the No-Fault Laws.

335.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $246,000.00 pursuant to the fraudulent billing submitted by Defendants.

336.    The extensive fraudulent conduct by Kofman, Shifteh, and DS Medical demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

337.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
**Against Kofman, Shifteh, and DS Medical**
**(Unjust Enrichment)**

338.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

339.     As set forth above, Kofman, Shifteh, and DS Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

340.     When GEICO paid the bills and charges submitted by or on behalf of DS Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

341.     Kofman, Shifteh, and DS Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, Shifteh, and DS Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

342.     Kofman, Shifteh, and DS Medical's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

343.     By reason of the above, Kofman, Shifteh, and DS Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $246,000.00.

<u>**AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION**</u>
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

344.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

345.     John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, Shifteh, and DS Medical.

346.     The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to DS Medical in exchange for unlawful kickbacks.

347.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for DS Medical to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through DS Medical.

348.    John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to DS Medical for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

349.    The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $246,000.00 pursuant to the fraudulent bills submitted through DS Medical.

350.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

351.    Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
**Against Kofman and A. Miller**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

352.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

353.     Shaare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

354.     Kofman and A. Miller knowingly have conducted and/or participated, directly or indirectly, in the conduct of Shaare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Shaare was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

355.     Shaare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kofman and A. Miller operated Shaare, inasmuch as Shaare never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Shaare to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

Shaare has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through Shaare to the present day.

356.   Shaare is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Shaare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

357.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $255,000.00 pursuant to the fraudulent bills submitted by the Defendants through Shaare.

358.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
**Against Kofman, A. Miller, and John Doe Defendants "1"-"10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

359.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

360.   Shaare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

361.   Kofman, A. Miller, and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Shaare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Shaare was not

eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were billed and performed pursuant to the direction of unlicensed laypersons; (ii) the Fraudulent Services were billed and performed as a result of Defendants' unlawful *quid pro quo*, kickback, and referral arrangements (iii) the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, which included creating MRI reports with fictitious patient histories and fabricated and/or grossly exaggerated "findings"—all to exploit the Insureds for financial gain; (iv) the Fraudulent Services were billed in violation of the Fee Schedule's requirements; and (v) in many cases, the Fraudulent Services were provided by independent contractors in violation of New York law. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

362.    Kofman, A. Miller, and John Doe Defendants "1"-"10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

363.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $255,000.00 pursuant to the fraudulent bills submitted by Defendants through Shaare.

364.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-NINTH CAUSE OF ACTION**
**Against Kofman, A. Miller, and Shaare**
**(Common Law Fraud)**

365.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

366.    Kofman, A. Miller, and Shaare intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

367.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were provided pursuant to the direction of unlicensed laypersons; (ii) in every claim, the representation that Defendants were acting lawfully and in compliance with all relevant laws and regulations governing healthcare practice and, therefore, eligible to receive No-Fault Benefits when, in fact, the Fraudulent Services were purportedly provided as the result of unlawful *quid pro quo*, kickback, and referral arrangements; (iii) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were billed and performed pursuant to predetermined protocols, without regard to medical necessity, that were designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (iv) in every claim, the representation that the Fraudulent Services were properly billed in accordance with the Fee Schedule, when in fact, the Provider Defendants billed for the Fraudulent Services in violation of the Fee Schedule's requirements; and (v) in many claims, the representation that the Fraudulent Services were performed by employees of the Provider

Defendants, when in fact the Fraudulent Services were performed by independent contractors in violation of New York law.

368.     Kofman, A. Miller, and Shaare intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Shaare that were not compensable under the No-Fault Laws.

369.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $255,000.00 pursuant to the fraudulent billing submitted by Defendants.

370.     The extensive fraudulent conduct by Kofman, A. Miller, and Shaare demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

371.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTIETH CAUSE OF ACTION
**Against Kofman, A. Miller, and Shaare**
**(Unjust Enrichment)**

372.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

373.     As set forth above, Kofman, A. Miller, and Shaare have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

374.     When GEICO paid the bills and charges submitted by or on behalf of Shaare for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

375.    Kofman, A. Miller, and Shaare have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kofman, A. Miller, and Shaare voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

376.    Kofman, A. Miller, and Shaare's retention of GEICO's payments violates the fundamental principles of justice, equity, and good conscience.

377.    By reason of the above, Kofman, A. Miller, and Shaare have been unjustly enriched in an amount to be determined at trial, but in no event less than $255,000.00.

### AS AND FOR A THIRTY-FIRST CAUSE OF ACTION
**Against John Doe Defendants "1"-"10"**
**(Aiding and Abetting Fraud)**

378.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

379.    John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kofman, A. Miller, and Shaare.

380.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme included, among other things, assisting with the performance of the Fraudulent Services and knowingly referring Insureds to Shaare in exchange for unlawful kickbacks.

381.    The conduct of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" through "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Shaare to begin operating and billing for high volumes of the Fraudulent Services, to obtain referrals of patients at the No-Fault Clinics, subject those patients to the Fraudulent Services, and obtain payment from GEICO and other insurers for the Fraudulent Services billed through Shaare.

382.     John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Shaare for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

383.     The conduct of John Doe Defendants "1" through "10" caused GEICO to pay more than $255,000.00 pursuant to the fraudulent bills submitted through Shaare.

384.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

385.     Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

386.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against all Defendants a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to GEICO in the name of the Provider Defendants;

B.     On the Second Cause of Action against Kofman, Rashbi Ventures, Rafailov, and Modnyy, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $104,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Kofman, Rashbi Ventures, Rafailov, Modnyy, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $104,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $104,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

E.      On the Fifth Cause of Action against Kofman, Rashbi Ventures, Rafailov, Modnyy, and Rashbi Diagnostics, more than $104,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $104,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Kofman, Modnyy, and Mizrahi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Kofman, Modnyy, and Mizrahi, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Kofman, Modnyy, Mizrahi, and Akiva, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

J.      On the Tenth Cause of Action against Kofman, Modnyy, Mizrahi, and Akiva, more than $15,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $15,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Kofman, Rafailov, A. Miller, and Mizrahi compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $37,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Kofman, Rafailov, A. Miller, and Mizrahi compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $37,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Kofman, Rafailov, A. Miller, Mizrahi, and I&A compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $37,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

O.      On the Fifteenth Cause of Action against Kofman, Rafailov, A. Miller, Mizrahi, and I&A, more than $37,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $37,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Kofman and H. Miller compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Kofman, H. Miller, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Kofman, H. Miller, and HMS, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

T.      On the Twentieth Cause of Action against Kofman, H. Miller, and HMS, more than $6,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $6,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Kofman and Shifteh, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $246,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Kofman, Shifteh, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $246,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Kofman, Shifteh, and DS Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $246,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

Y.      On the Twenty-Fifth Cause of Action against Kofman, Shifteh, and DS Medical, more than $246,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $246,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

AA.    On the Twenty-Seventh Cause of Action against Kofman and A. Miller, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $255,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Kofman, A. Miller, and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $255,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.    On the Twenty-Nine Cause of Action against Kofman, A. Miller, and Shaare, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $255,000.00, together with punitive damages, costs, interest, and other and further relief as the Court deems proper;

DD.    On the Thirtieth Cause of Action against Kofman, A. Miller, and Shaare, more than $255,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

EE.    On the Thirty-First Cause of Action against John Doe Defendants "1"-"10", compensatory damages in an amount to be determined at trial but in excess of $255,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Dated: September 17, 2024
Uniondale, New York

RIVKIN RADLER LLP

By   /s/ *Barry I. Levy*

Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
John P. Mulvaney, Esq.

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government
Employees Insurance Company,
GEICO Indemnity Company, GEICO
General Insurance Company and
GEICO Casualty Company*